IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN CURTICIAN, | ) | |
| Plaintiff, | ) | C.A. No. 07-286 Erie |
| | ) | |
| v. | ) | |
| | ) | District Judge Cohill |
| UNIT MANAGER KESSLER, et al., | ) | Magistrate Judge Baxter |
| Defendants. | ) | |

# MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I.     RECOMMENDATION

It is respectfully recommended that Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [Document # 41] be granted in part and denied in part.

## II.    REPORT

### A.     Relevant Procedural and Factual History

On October 17, 2007, Plaintiff Steven Curtician, a prisoner incarcerated at the State Correctional Institution at Albion, Pennsylvania ("SCI-Albion"), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Named as Defendants are: Unit Manager Kessler ("Kessler"); Marilyn Brooks, former Superintendent at SCI-Albion ("Brooks"); SCI-Albion's Certified Emergency Response Team ("CERT"); Jeffrey Beard, Secretary of the Pennsylvania Department of Corrections ("Beard"); Patty McKissock, Hearing Examiner at SCI-Albion ("McKissock"); and Lt. William McConnell, corrections officer at SCI-Albion ("McConnell").

In his original Complaint, Plaintiff alleges that Defendants Kessler, Brooks, CERT, and Beard violated his Eighth Amendment rights by placing undesirable and "irresponsible" inmates in his cell "with the element of intent to specifically harm" him. (Complaint at ¶¶ 2C, 4, 6, 7, 9, 14-16). Plaintiff also claims that Defendants have retaliated against him for filing numerous grievances and inmate requests by dismissing all of his grievances out of hand, conducting

"investigations and illegal cell searches," and "moving [him] from block to block and cell to cell as a deterrent to filing grievances." (Id. at ¶¶ 8B, 17, 18).

In particular, Plaintiff alleges that Defendants placed an "inmate Pehlman" in his cell, who was found to have a "shank" in his personal effects. (Id. at ¶ 4). Plaintiff claims that Defendant CERT gave the "shank" back to Perlman despite Plaintiff's prior grievance that he was having problems with this inmate. (Id. at ¶ 5). Inmate Pehlman was subsequently removed from Plaintiff's cell and replaced with "another mentally disturbed inmate Stiefel,… who is intimidating in physical size and was removed from his prior cells as being a threat to his other cell mates." (Id. at ¶ 6).

Previously, in April or May 2005, Plaintiff alleges that he was moved to the honor block, where he was placed in a cell "with this dirty old man who was in for rape." (Id. at ¶ 8B). Plaintiff was able to get out of that cell by unwittingly entering a cell agreement with an inmate who was a child molester. (Id.). After this inmate "was taken ATA," Plaintiff entered a cell agreement with "another white man" named Forbes; however, this cell agreement "suddenly disappeared" and a Sergeant Fike then "tried to force" him to share a cell with a "black inmate," but Plaintiff refused. (Id.). Plaintiff then complained to his unit manager and Defendant Brooks that Sergeant Fike was harassing and retaliating against him due to a misconduct he received in 2003, "but [his] complaints were simply dismissed." (Id.).

About a month later, Plaintiff was informed by Defendant McKissock that he would "once again be forced to give [his] bed to yet another black muslim that needed a bottom bunk." As a result, Plaintiff "began writing complaints as to the discriminating and harassing nature of these moves, especially since every time a bed for a black inmate was needed, [his] bed was always the bed taken to make accommodations for these inmates when there are many black cells they could have gone to." (Id.). However, "[a]ll [his] complaints were simply dismissed," and he was then constantly harassed by corrections officers Fike and Harvey, whose actions were allegedly defended by Plaintiff's unit manager. (Id.). Thus, Plaintiff asked to be transferred

2

to another facility before Fike or Harvey could issue him a misconduct, but this request went unheeded. (Id.).

In November 2005, Plaintiff received a misconduct for having a razor blade in his personal effects; however, the misconduct was reduced to a Class II infraction because the corrections officer improperly searched Plaintiff's locker. (Id.). Nevertheless, at his annual review in 2006, Plaintiff was removed from the honor block as a result of the misconduct, and his custody level was raised from level 2, minimum, to level 3, medium. (Id.). Plaintiff "wrote a total of 11 or 12 grievances in 2006" regarding the increase in custody level and his removal from honor block, but his complaints "were either ignored, denied or simply rejected." (Id.).

In 2007, Plaintiff alleges that he "filed approximately 12 to 15 grievances and a number of request slips from not being able to get [his] toilet fixed,... to the continued withholding of [his] level 2 for the class II misconduct from November of 05," all of which were denied. (Id.). Plaintiff also indicates that he filed a grievance against a corrections officer for not letting him out of his cell to report to a mandatory medical call-out, "yet I have no merit on any grievance I've ever filed." (Id.).

On June 24, 2008, Plaintiff filed an Amended Complaint adding McConnell and McKissock as Defendants, against whom he raises retaliation, Eighth Amendment, and/or Fourteenth Amendment due process claims. (Document # 22). In particular, Plaintiff alleges that, on December 7, 2007, he was ordered to report to Defendant McConnell regarding a request slip he sent to the superintendent complaining about Defendant Kessler's placement of a Muslim in his cell. (Document # 22 at ¶ 9). In his request slip, Plaintiff claimed that Defendant Kessler "knowingly placed [him] in jeopardy due to [his] numerous Nazi tattoos, in relation to the Muslim views and adversions [sic] to such beliefs...." (Id. at ¶ 13). According to Plaintiff, Defendant McConnell informed him that "he had no choice in who was placed into his cell," in response to which Plaintiff informed McConnell that, if Kessler continued to "place him in danger, [he] would be forced to file a complaint with the [Pennsylvania State Police] for reckless

endangerment." (Id. at ¶ 9). Defendant McConnell then placed Plaintiff in segregation and issued a misconduct against him for making threats. (Id.). Plaintiff claims that Defendant McConnell's "acquiescence [in Kessler's assignment of a Muslim cellmate] shows a total disregard to plaintiff's plight and safety...." (Id. at ¶ 13).

Plaintiff claims that Defendant McKissock violated his due process rights by presiding over the hearing on the misconduct that was issued against him by Defendant McConnell, because she "could not be considered an 'impartial hearing body'" due to the fact that, as Plaintiff's former unit manager, she previously forced him to share a cell with a Muslim inmate. (Id. at ¶ 14).

On September 19, 2008, Plaintiff filed a Second Amended Complaint against all Defendants [Document # 39], making further retaliation and Eighth Amendment claims based upon their placement of more inmates in his cell who he deems undesirable and/or a danger to his safety. Specifically, Plaintiff alleges that, on August 1, 2008, he was sent to F-unit, where the unit manager "tried to place him in with yet another black inmate." (Document # 39 at ¶ 4). When Plaintiff refused the cell assignment, he received a misconduct for failing to obey an order and was placed in the restrictive housing unit ("RHU"). (Id.).

After he was let out of the RHU, he was sent back to Defendant Kessler's unit, where he was placed "with another Muslim." (Id. at ¶ 7). Plaintiff claims that Defendant Kessler did this "maliciously ... in attempt to get [him] to hurt someone or to get someone to hurt [him]." (Id.).

Defendants have filed a motion to dismiss, or in the alternative, motion for summary judgment [Document # 41], arguing, *inter alia*, that (i) the Eleventh Amendment bars suit against the Defendants in their official capacity, and (ii) Plaintiff has failed to state a claim upon which relief may be granted. Plaintiff has filed a response to Defendants' motion, in which he also seeks to further supplement his complaint to indicate that, on October 27, 2008, "after being given a direct order to move in with inmate Stiefel, who was used to intimidate the plaintiff in 07 on B-B unit where Kessler was the unit manager and was in charge of the care, custody and

control of these two inmates, plaintiff suffered a broken jaw at the hands of inmate Stiefel that required a surgery and a titanium plate to reconstruct." (Document # 51 at ¶ 13).[1] This matter is now ripe for consideration.

**B.     Standards of Review**

    **1.     Motion to Dismiss**

Rule 8(a) of the Federal Rules of Civil Procedure states that a pleading must set forth a claim for relief which contains a short and plain statement of the claim showing that the pleader is entitled to relief. A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded allegations of the complaint must be accepted as true. Neitzke v. Williams, 490 U.S. 319 (1989); Estelle v. Gamble, 429 U.S. 97 (1976).   The issue is not whether the plaintiff will prevail at the end but only whether he should be entitled to offer evidence to support his claim. Neitzke; Scheuer v. Rhodes, 419 U.S. 232 (1974).   As the United States Supreme Court recently held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), a complaint must be dismissed pursuant to Rule 12 (b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." Id. at 570 (rejecting the traditional 12 (b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41 (1957)). See also Ashcroft v. Iqbal, ___ U.S. ___, ___, ___ S.Ct. ___, ___ 2009 WL 1361536 (May 18, 2009) (specifically applying Twombly analysis beyond the context of the Sherman Act).   The court must accept as true all allegations of the complaint and all reasonable factual inferences must be viewed in the light most favorable to plaintiff. Angelastro v. Prudential-Bache Securities, Inc., 764 F.2d 939, 944 (3d Cir. 1985).   The Court, however, need not accept inferences drawn by plaintiff if they are unsupported by the facts as set

---

[1] The Court accepts and will consider Plaintiff's supplement, as it relates to the events of October 27, 2008. All parties were previously made aware of, and had an opportunity to address on the record, these same allegations, which were raised in Plaintiff's motion for temporary restraining order [Document # 46] that was heard by this Court on December 12, 2008.

5

forth in the complaint. See California Pub. Employee Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) citing Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).  Nor must the court accept legal conclusions set forth as factual allegations. Twombly, 550 U.S. at 555 citing Papasan v. Allain, 478 U.S. 265, 286 (1986).  "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. Although the United States Supreme Court does "not require heightened fact pleading of specifics, [the Court does require] enough facts to state a claim to relief that is plausible on its face." Id. at 570.

### 2. Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."  Id.

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. See Fed.R.Civ.P. 56(c); Krouse v. American Sterilizer Co., 126 F.3d 494, 500 n.2 (3d Cir. 1997).  The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990).  Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential

6

fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will effect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegation or suspicions." Firemen's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

### 3. *Pro Se* Pleadings

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" Haines v. Kerner, 404 U.S. 519, 520-521(1972). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor

syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir. 1969)(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); Freeman v. Department of Corrections, 949 F.2d 360 (10th Cir. 1991). Under our liberal pleading rules, a district court should construe all allegations in a complaint in favor of the complainant. Gibbs v. Roman, 116 F.3d 83 (3d Cir.1997). See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Company, 906 F.2d 100, 103 (3d Cir. 1990)(same). Because Plaintiff is a *pro se* litigant, this Court will consider facts and make inferences where it is appropriate.

### C. Discussion
#### 1. Official Capacity Claims

The individual Defendants assert that, to the extent Plaintiff is suing them in their official capacities for monetary damages, they are immune from suit under the Eleventh Amendment. This Court agrees. It is well settled that suits for damages by individuals against state governments, state agencies, or state officers acting in their official capacities are barred by the Eleventh Amendment. See Kentucky v. Graham, 473 U.S. 159, 165-67 (1985)(holding that claims for damages against a state officer acting in his official capacity are barred by the Eleventh Amendment); Chittister v. Dep't of Community and Economic Development, 226 F.3d 223 (3d Cir. 2000)(holding that individuals are barred from seeking monetary damages from state governments or state agencies). See also Bey v. Pennsylvania Department of Corrections, 98 F.Supp.2d 650, 657 (E.D. Pa. 2000) wherein the court summarized well-established law, observing that:

> [t]he Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S.

8

> Const. amend. XI. Thus, under the Eleventh Amendment, absent express consent by the state in question or a clear and unequivocal waiver by Congress, states are immune from suit in federal court. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996).

Id.; see also Koslow v. Commonwealth of Pennsylvania, 302 F.3d 161 (3d Cir. 2002).

No exceptions to Eleventh Amendment immunity are applicable here. The Commonwealth of Pennsylvania has not consented to be sued. Wilson v. Vaughn, No. 93-C.V.-6020, 1996 WL 426538, *1 n.2 (E.D.Pa. July 30, 1996)(citing, 42 Pa. Con. Stat. Ann. §8521(b)). Congress has not expressly abrogated Pennsylvania's Eleventh Amendment immunity from civil rights suits for damages. Smith v. Luciani, No. 97-3613, 1998 WL 151803, *4 (E.D.Pa. March 31, 1998), aff'd, 178 F.3d 1280 (3d Cir. 1999)(Table). Thus, any claims for monetary damages against the individual Defendants in their official capacities should be dismissed.

### 2. Defendants Beard and Brooks

Defendants Beard and Brooks argue that they should be dismissed from this case because Plaintiff has failed to allege their personal involvement and therefore has failed to state a claim against them. The Court disagrees.

The following comprise the totality of Plaintiff's allegations against Defendants Beard and Brooks:

> I wrote a complaint to ... superintendent Brooks complaining that Sgt. Fike was harassing me and retaliating on me due to the misconduct from 03 but my complaints were simply dismissed. (Complaint at ¶ 8B, p. 3).
>
> \*　　　　　　　　\*　　　　　　　　\*
>
> I wrote to Secretary Beard. (Complaint at ¶ 8B, p. 5).

When a supervisory official is sued in a civil rights action, liability can only be imposed if that official played an "affirmative part" in the complained-of misconduct. Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986). Although a supervisor cannot encourage constitutional violations, a supervisor has "no affirmative constitutional duty to train, supervise

9

or discipline so as to prevent such conduct." Id. quoting Brown v. Grabowski, 922 F.2d 1097, 1120 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991). The supervisor must be personally involved in the alleged misconduct. Rode v. Dellarciprete, 845 F.2d 1958, 1207 (3d Cir. 1988). Section 1983 liability cannot be predicated solely on *respondeat superior*. Rizzo v. Goode, 423 U.S. 362 (1976); see also Monell v. Department of Social Services, 436 U.S. 658 (1978) (superiors of line officers who act in violation of constitutional rights may not be held liable on a theory of vicarious liability merely because the superior had a right to control the line officer's action); Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293-1295 (3d Cir. 1997) (to hold police chief liable under § 1983 for violating female subordinate officer's rights, she was required to prove that he personally participated in violating the her rights, that he directed others to violate her rights, or that he had knowledge of and acquiesced in his subordinates' violations). If a grievance official's only involvement is investigating and/or ruling on an inmate's grievance after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that official. Rode, 845 F.2d at 1208; Cooper v. Beard, 2006 WL 3208783 at * 14 (E.D.Pa. Nov. 2, 2006).

Here, Plaintiff has not alleged any personal involvement on the part of either Defendant Beard or Defendant Brooks with regard to any of his claims in this case. At most, each Defendant was simply asked to investigate or rule on a grievance after the incident giving rise to the grievance had already occurred. These allegations are insufficient to state a claim upon which relief may be granted against Defendants Beard and Brooks, and Defendants' motion to have them dismissed from this case should be granted.

### 3. Eighth Amendment Claim - Deliberate Indifference to Health and Safety

To succeed on an Eighth Amendment claim alleging a failure to protect, a plaintiff must show that: (i) he is incarcerated under conditions posing a substantial risk of serious harm;" and (ii) the prison official acted with "deliberate indifference" to his health and safety. Farmer v.

10

Brennan, 511 U.S. 825, 834 (1994). To be deliberately indifferent, a prison official must "know of and disregard an excessive risk to inmate health or safety." Id. at 837. Mere negligence on the part of the prison official does not give rise to a constitutional violation. See Daniels v. Williams, 474 U.S. 327, 330-331 (1986).

Here, Plaintiff contends that Defendants failed to protect him because they forced him to share a cell him with, among others: (i) inmate Pehlman, who was allegedly found to have a "shank" in his personal effects; (ii) inmate Stiefel, a "mentally disturbed inmate,... who is intimidating in physical size and was removed from his prior cells as being a threat to his other cell mates" (Complaint at ¶ 6); (iii) "a dirty old man who was in for rape" (Id. at ¶ 8B); and (iv) several black Muslim inmates.

### i. Inmate Pehlman

Defendants point out that the "shank" Plaintiff accused Pehlman of possessing was found to be a five inch plastic comb that Pehlman altered to use as a moustache comb. (Document # 28, Exhibit A at p. 2). Thus, it was determined that Pehlman posed no threat to Plaintiff. (Id.). Even so, Plaintiff acknowledges that Pehlman was removed from his cell shortly after the "shank" incident. (Complaint at ¶ 6). As a result, Defendants cannot be found to have been deliberately indifferent to Plaintiff's safety by placing inmate Pehlman in his cell.

### ii. "Dirty Old Man"

With regard to the placement of a "dirty old man who was in for rape" in Plaintiff's cell, this Court fails to see how causing Plaintiff to be celled with a fellow sex offender placed him at risk of serious harm. While such placement may have offended Plaintiff in some way, it certainly didn't endanger him. No Eighth Amendment violation is implicated here.

### iii. Black Muslim Inmates

Plaintiff's claim that Defendants failed to protect him by "forcing" him to share a cell with various black Muslim inmates is equally unfounded. Plaintiff openly admits to being a white supremacist, as confirmed by the "numerous Nazi tattoos" displayed on his body. (Complaint at ¶ 13). As a result, Plaintiff has grieved that "[a]s I'm a white supremacist, placing me in with a Muslim or black or Spanish inmate is placing my safety in danger as you can never know how they may react to my German (Swastika) tattoos." (See Document # 41, Exhibit A at p. 1). However, there is no evidence that any altercation ever occurred during these cell arrangements, nor that any risk of serious harm ever existed, other than the perceived danger conjured up by Plaintiff's blatant racism. Thus, Plaintiff has failed to state a failure to protect claim in this regard.

### iv. Inmate Stiefel

Plaintiff's claim regarding his cell arrangement with inmate Stiefel is another story. In particular, Defendant Kessler's recent placement of inmate Stiefel in Plaintiff's cell has validated Plaintiff's previously expressed concern for his safety and gives rise to a cognizable failure to protect claim under the Eighth Amendment. The record discloses that Defendant Kessler was familiar with the past behavior of both Plaintiff and inmate Stiefel by virtue of her previous assignment as unit manager of their cellblock. (Document # 46 at ¶¶ 11-12; Document # 51 at ¶ 13). During a telephone hearing before this Court on December 12, 2008, Defendant Kessler acknowledged on several occasions that both Plaintiff and Stiefel were difficult inmates who didn't get along with any of their cellmates. (Document # 48 at p. 2). She also acknowledged that Plaintiff and Stiefel had previously been celled together and didn't get along. (Id.). Furthermore, she had knowledge of Plaintiff's previously stated safety concerns regarding his placement with Stiefel in 2007, as set forth in the original Complaint in this matter. (Complaint at ¶ 6). Nevertheless, on October 27, 2008, Defendant Kessler gave a direct order that Plaintiff be celled with Stiefel, an arrangement that immediately resulted in an assault by

Stiefel upon Plaintiff that left Plaintiff with a broken jaw that required surgical reconstruction supported by a titanium plate in his chin. (Document # 46 at ¶¶ 6-10; Document # 51 at ¶ 13).

A remarkably similar case was considered by the United States District Court for the Southern District of Illinois in Vinning-El v. Walls, 2008 WL 834472 (S.D.Ill. Mar. 26, 2008). In Walls, the defendant corrections officer placed the plaintiff in a cell with an inmate Franklin, despite having been informed by plaintiff that: (i) he and inmate Franklin had argued on previous occasions; (ii) he and inmate Franklin would not get along; and (iii) he feared inmate Franklin would injure him. Walls at * 3. On the day he was placed with inmate Franklin, the plaintiff and Franklin had an altercation that left plaintiff with a laceration above his left eye and a right leg contusion. Id. at * 1. The Walls court found that "by placing plaintiff and inmate Franklin in a cell together, [the] defendant [] exposed plaintiff to a *substantial* risk of harm because a fight between plaintiff and inmate Franklin would almost certainly occur if they were left in a cell together." Id. at * 3 (emphasis in original).

The same reasoning holds true here. Accordingly, this Court finds that Plaintiff has sufficiently set forth an Eighth Amendment failure to protect claim against Defendant Kessler with regard to her placement of Plaintiff in inmate Stiefel's cell on October 27, 2008, and Defendants motion for summary judgment in this regard should be denied.

### 4. Change in Custody Level

Plaintiff claims that Defendants violated his constitutional rights by removing him from the honor block and raising his custody level from level 2, minimum, to level 3, medium. To the extent this claim is intended to raise a due process violation, it must fail, as a change in custody level fails to implicate a protected liberty interest. See, e.g., Hart v. Whalen, 2008 WL 4107651 at * 6 (M.D.Pa. July 29, 2008)("no Constitutional right to any particular custody status"); Wilson v. Horn, 971 F.Supp. 943, 947 (E.D.Pa. 1997)(inmate "has no federal constitutional right to a particular custody status...."); Adams v. Hunsberger, 2007 WL 2814594

at * 6 (W.D.Pa. Sept. 25, 2007)("... neither does Plaintiff's increase in custody level or security classification implicate a liberty interest")(citations omitted).

To the extent Plaintiff is attempting to asset an Eighth Amendment violation, Plaintiff must show "that he suffered a deprivation of basic human needs such as food, clothing, shelter, sanitation, medical care, or personal safety." McGrath v. Johnson, 67 F.Supp.2d 499, 513-14 (E.D.Pa. 1999), citing Griffin v. Vaughn, 112 F.3d 703, 709 (3d Cir 1997). A change in custody level has not deprived Plaintiff of a basic human need. See Padilla v. Beard, 206 Fed.Appx. 123, 125 (3d Cir. 2006), citing Inmates of Occoquan v. Barry, 844 F.2d 828, 836 (D.C.Cir. 1988)(holding that an increase in the inmate's custody classification "clearly is insufficient to rise to [the] level" needed to establish an Eighth Amendment violation as "certain 'deprivations,' such as limited work and educational opportunities, do not even fall within the broad compass of 'punishments' within the meaning of the Constitution").

Based on the foregoing, therefore, Plaintiff's claim regarding the increase in his custody level should be dismissed for failure to state a claim upon which relief may be granted.

### 5. Retaliation

Retaliation for the exercise of one's constitutional rights is a separate matter, requiring a distinct legal analysis. "Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983." See White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir.1990). "Government actions, which standing alone, do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), quoting Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).

In order to state a prima facie case of retaliation, a prisoner must demonstrate:
> 1) the conduct in which he was engaged was constitutionally protected;

14

2) he suffered "adverse action" at the hands of prison officials[2]; and

3) his constitutionally protected conduct was a substantial or motivating factor in the decisions to discipline him.[3]

Carter v. McGrady, 292 F.3d 152, 157-58 (3d Cir. 2002), quoting Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). Following the satisfaction of a prima facie case of retaliation, the burden then shifts to the defendants to demonstrate, by a preponderance of the evidence, that their actions would have been the same, even if Plaintiff were not engaging in the constitutionally protected activities. Carter, 292 F.3d at 158. "Once a prisoner has demonstrated that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334. In evaluating a prison official's opinion, "[p]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979).

Here, Plaintiff claims that Defendants retaliated against him for filing numerous grievances, requests to staff, and complaints by: (i) dismissing all of his grievances out of hand; (ii) conducting "investigations and illegal cell searches;" (iii) "moving [him] from block to block

---

[2] To show an "adverse action," the plaintiff must demonstrate that defendants' action were "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." Allah v. Al-Hafeez, 208 F.Supp.2d 520,535 (E.D. Pa. June 24, 2002), quoting Allah v. Seiverling, 229 F.3d at 225. See also Dixon v. Brown, 38 F.3d 379, 379 (8th Cir. 1994) (a plaintiff "need not show a separate, independent injury as an element of the case ... because the retaliatory disciplinary charge strikes at the heart of an inmate's constitutional right to seek redress of grievances, [and] the injury to his right inheres in the retaliatory conduct itself.").

[3] In analyzing the third element of the retaliation test, the court must determine whether there is a causal connection between the exercise of the constitutional rights and the adverse actions. "A suggestive temporal proximity between the protected activity and an alleged retaliatory act may be sufficient to meet the causal link requirement of the prima facia case." Allah v. Al-Hafeez, 208 F.Supp.2d at 535, citing Rauser, 241 F.3d at 330 and Johnson v. Rendell, 56 F.Supp.2d 547, 552 (E.D. Pa. 1999).

15

and cell to cell as a deterrent to filing grievances;" and (iv) placing him with inmates who he deems undesirable and/or a danger to his safety.

### i.     Constitutionally Protected Activity

Plaintiff has met the first prong of a retaliation claim, as filing grievances, requests to staff, and complaints are protected forms of free speech under the First Amendment.

### ii.     Adverse Action

To satisfy the second prong, Plaintiff must show that the alleged retaliatory acts rose to the level of adverse action. This means that Plaintiff's allegations must be sufficient to demonstrate that the adverse consequences he allegedly suffered would deter a person of ordinary firmness from engaging in constitutionally protected activity. Defendants argue that Plaintiff suffered no adverse action at the hands of Defendants because "he was not chilled one bit from exercising his constitutional rights," as evidenced by "the mere fact that [h]e has filed, and continues to file, countless grievances/requests/complaints to DOC officials at all levels...." (Document # 42 at pp. 19-21). "The test for adverse action, however, is objective, not subjective, and whether the plaintiff was actually deterred by the defendant's retaliatory acts is not dispositive." Brooks v. Smith, 2007 WL 3275266 at * 11 (M.D.Pa. 2007)(citations omitted).

Here, it is reasonable to presume that all of the various adverse consequences Plaintiff allegedly suffered would deter a person of ordinary firmness from engaging in constitutionally protected activity. Thus, Plaintiff has satisfied the second prong of his retaliation claim.

### iii.     Causal Connection

To satisfy the third prong of his retaliation claim, Plaintiff must allege a causal connection between his constitutionally protected activity of filing grievances, requests and complaints, and

16

the adverse actions he allegedly suffered at the hands of the Defendants. According to the record in this case, Plaintiff continually filed numerous requests to staff, grievances, and complaints during the time period in which he claims the allegedly adverse actions occurred. Defendants, themselves, note that Plaintiff has alleged that: "[he] filed somewhere around 12 request slips" (Complaint at ¶ 8B, p. 3); "[he] continued to file complaints throughout 2006 by way of request slips and grievances to several staff members" (Id., p. 4); "[he] wrote a total of 11 or 12 grievances in 2006," and "[i]n 2007, [he] filed approximately 12 to 15 grievances and a number of request slips...." (Id., p. 5). (See Document # 42 at p. 20). Thus, Plaintiff has alleged, at least, a temporal proximity between the administrative remedies he filed and Defendants' alleged adverse actions to suggest a causal link sufficient to satisfy the third prong of his retaliation claim. See Allah v. Al-Hafeez, 208 F.Supp.2d at 535.

Based on the foregoing, Plaintiff has sufficiently alleged a *prima facie* case of retaliation. Thus, it is Defendants' burden to prove "that they would have made the same decision[s] absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334. Defendants have failed to meet this burden at this juncture. Accordingly, Defendants' motion to dismiss, or in the alternative, motion for summary judgment with regard to Plaintiff's retaliation claim should be denied.

### 6. Due Process Claim Against Defendant McKissock

Plaintiff claims that Defendant McKissock violated his due process rights by presiding over the hearing on the misconduct that was issued against him by Defendant McConnell, because she "could not be considered an 'impartial hearing body'" due to the fact that, as Plaintiff's former unit manager, she previously forced him to share a cell with a Muslim inmate. (Id. at ¶ 14). As a result of the misconduct hearing in question, Plaintiff was found guilty and received a sanction of 60 days of disciplinary custody, which was later reduced to 30 days by the Program Review Committee. (See Document # 22, Amended Complaint, Exhibit A).

Initially, the Court notes that "prison disciplinary proceedings are not part of a criminal prosecution and the full panoply of rights due a defendant in such proceedings does not apply." Wolfe v. McDonnell, 418 U.S. 539, 556 (1974). In the context of institutional misconduct hearings, "due process requires only that there 'be some evidence' supporting a disciplinary decision... and it is the hearing examiner's providence, and not this court's, to gauge the credibility of evidence and witnesses at a misconduct hearing." Rauso v. Vaughn, 2000 WL 873285 at * 8 (E.D.Pa. June 26, 2000), citing Massachusetts Correctional Inst. v. Hill, 472 U.S. 445, 455-56 (1985).

Although Plaintiff claims that Defendant McKissock was biased because she previously "forced" him to share a cell with a black Muslim inmate, there is nothing in the record to support his claim. In her disciplinary hearing report, Defendant McKissock found "a preponderance of evidence to establish that Curtician did threaten 'to hurt someone' if he was celled with a black or muslim inmate." (Document # 22, Amended Complaint, Exhibit A at p. 5). In fact, she found that Plaintiff "restates this today in his testimony." (Id.). Thus, there was, at least, "some evidence" to support Defendant McKissock's disciplinary decision, which belies Plaintiff's claim of bias. Moreover, Plaintiff cannot show that his disciplinary sanction of only 30, or even 60, days imposed an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). See Griffin v. Vaughn, 112 F.3d 703 (3d Cir. 1997)(holding that 15 months in administrative custody did not impose an atypical and significant hardship on prisoner); Abney v. Walker, 2007 WL 1454265 (W.D.Pa. May 17, 2007)(75 days in the RHU does not trigger due process violation). As a result, Defendant McKissock should be granted summary judgment with regard to Plaintiff's due process claim against her.

### III.  CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendants' motion to

dismiss or, in the alternative, motion for summary judgment [Document # 20] be granted in part and denied in part, as follows:

1. Plaintiff's claims against Defendants Beard and Brooks should be dismissed for failure to state a claim upon which relief may be granted and said Defendants should be terminated from this case;

2. Plaintiff's claims for monetary damages against the individual Defendants in their official capacities should be dismissed, based on sovereign immunity;

3. Defendants' motion should be denied with regard to Plaintiff's Eighth Amendment failure to protect claim against Defendant Kessler regarding his placement in inmate Stiefel's cell;

4. Summary judgment should be granted in favor of Defendants with regard to the remainder of Plaintiff's Eighth Amendment failure to protect claims;

5. Summary judgment should be entered in favor of Defendants with regard to Plaintiff's claim(s) arising from the increase in his custody level;

6. Defendants' motion should be denied with regard to Plaintiff's retaliation claim; and

7. Summary judgment should be granted in favor of Defendant McKissock with regard to Plaintiff's due process claim.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Failure to timely file objections may constitute a waiver of appellate rights. See Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
Chief United States Magistrate Judge

Dated: May 29, 2009

cc: The Honorable Maurice B. Cohill
United States District Judge